vacated by that of the general term reversing the judgment and granting a new trial, but the omission there to direct the new trial before another referee was no reason why application could not be effectually made for such purpose at special term, and without the necessity of application to the general term for modification of its order in that respect. And the effect of the order appealed from was the vacation of the order appointing the referee by whom the trial was had. It is no answer to the right of one of the parties to seek the appointment of another referee that they may have consented to proceed to the new trial before the same referee, and the failure of either party to move for the appointment of another referee might be treated as such consent. Catlin v. Adirondack Co., 81 N. Y. 379. In the cited case of Maicas v. Leony, 113 N. Y. 619, 20 N. E. 586, the trial of the issues referred was not completed, and the findings of the referee upon which the interlocutory judgment was entered ex parte were imperfect, and for that reason such judgment and report were set aside. The court held that the case should not be sent to another referee, but that the uncompleted trial should be continued before the same referee, as there was no charge of misconduct on his part. That case does not support the asserted view of the learned counsel for the defendant. There is no occasion, upon the facts presented, for the consideration of the question whether the court can vacate the order of reference appealed from, and thus make the action triable by the court only. It is sufficient to say that the exercise of such power is quite questionable, against the protest of one of the parties, without causes not appearing in this case. The fact that the party plaintiff is other than the one by whom the action was originally commenced, and who was such when the stipulation to refer was made, is not available to the defendant. The action is the same, and the present plaintiff moved for the order appealed from. The case of Wood v. Swift, 81 N. Y. 31, has no essential application to the question presented here.

The order should be affirmed. All concur.

---

(9 App. Div. 400.)

MASONIC LIFE ASS'N OF WESTERN NEW YORK v. CRANDALL et al.

(Supreme Court, Appellate Division, Fourth Department. October 16, 1896.)

1. PAYMENT UNDER MISTAKE—RECOVERY.
　　Money paid by an insurer under the mistaken belief that insured was dead may be recovered.

2. SAME—CONTRACT.
　　An insurer may recover money paid to the beneficiary under the mistaken belief that insured was dead, though the money was, by agreement between insured and the beneficiary, transferred to a trustee to be held for a certain time, and to be repaid to the beneficiary in case it was not proved that insured was alive, and was after such time repaid to the beneficiary.

3. CONTRACT—CONSIDERATION.
　　Where money has been paid by insurer to the beneficiary under the mistaken belief that insured was dead, an agreement between the parties for the transfer of the property purchased therewith to a trustee, to be

held to await an investigation as to insured's death, and to be transferred to insurer on its being shown that insured was alive, is supported by a sufficient consideration.

Appeal from special term, Erie county.

Action by the Masonic Life Association of Western New York against Susan A. Crandall and others. There was a judgment in favor of plaintiff, and defendant Susan A. Crandall appeals. Affirmed.

The opinion of SPRING, J., was as follows:

Bryant B. Crandall in 1881 was insured in plaintiff's company for the sum of $2,000; his wife, the defendant Susan A. Crandall, being named as the beneficiary in the policy or certificate of insurance. In 1886 the insured was supposed to have been drowned in Niagara river. What were then identified as his remains were buried, and the usual proofs of death, conformable to the conditions of the policy, were furnished, and thereupon the said $2,000 were paid to the said beneficiary by plaintiff. Crandall at the time of his supposed demise held other insurance policies on his life, aggregating, exclusive of the one held with plaintiff, the sum of $6,500, in each of which his wife was the designated beneficiary, and payment was made by each of these companies upon proofs showing the death of the insured. In 1887 rumors were rife that Crandall was alive. An agreement was thereupon entered into between Mrs. Crandall and these several insurance companies, whereby the property she had purchased with the avails of this insurance money, and the money still held by her, and a bond and mortgage which was an investment made from the avails of these policies, were paid or transferred to Charles F. Bishop as trustee. By the provisions of this agreement, Mr. Bishop was to hold the money and property in this fiduciary capacity for three years, during which period, if these companies established by satisfactory proof that Crandall was alive, then the property was to be converted into money, and distributed among them in proportion to their several interests. If, however, they failed to establish that fact within the stipulated period, then the money and property were to be paid and transferred to Mrs. Crandall, and the trust terminated. During the existence of this trust she was to be permitted to occupy the dwelling house constructed with the insurance money received by her, and was to be paid interest at the rate of 6 per cent. per annum on the residue of the property of which Mr. Bishop was the custodian. Under this arrangement she assigned the bond and mortgage, executed a conveyance of the dwelling-house lot, and paid the money held by her to the chosen trustee; and this property amounted to about $7,900, the remainder having been used by her. After the three years had elapsed the trustee reconveyed the premises, paid the money, and reassigned the bond and mortgage to her, as no satisfactory proof had been adduced to prove Crandall was alive. In 1892 the officers of plaintiff received word the husband was under arrest at Los Angeles, in California. Mr. Tiffany, the secretary of plaintiff, went to Mrs. Crandall's house, and urged her to make another agreement transferring the money and property again to Mr. Bishop as trustee, until it could be ascertained definitely if the man so apprehended was in fact the husband of defendant. Mrs. Crandall on the following day, by appointment, went to Mr. Tiffany's office. The agreement was there executed and consummated by the conveyance of the house and lot, and of an undivided interest in a land syndicate. At that time she had deposited to her credit in the Erie County Savings Bank $3,101.69, and in the Western Savings Bank $2,961.82, which sums were derived from the said insurance on the life of her husband. Within a few days it was positively known Crandall was the person apprehended in Los Angeles. He was brought to Buffalo, and identified as the husband of the defendant. Mrs. Crandall thereupon forbade the savings banks paying over this money, and this action is the result.

A bare statement of these facts is all-sufficient to show how utterly without merit is Mrs. Crandall's defense in this case. Her right to the insurance money did not attach until her husband died, and with the fact undisputed

that he was alive when the proofs of death were made, and has been ever since, she cannot evade the repayment of these moneys, however much it may be hedged about by agreements that were made to give an opportunity to arrive at the truth. She was confronted with the statement that her husband was alive. Like any conscientious woman, she wished no imputation resting on her that she was the recipient of money to which she had not the semblance of title. She accordingly entered into the first agreement with Bishop as trustee. The rights of the parties to this fund were in no sense changed by the making of this contract. Without it she would be liable to refund the money in case Crandall were alive, for his death was the essential prerequisite to her right to it. Under the agreement the same condition inhered. It preserved the property intact to the insurers in case Crandall should be found, and it protected her in the event there was no foundation for the rumors he was in the flesh. After the lapse of three years, had a period of time passed before repayment to her, in which Crandall had been discovered, that would have been an irresistible defense to her action to compel repayment. The infirmity in her case would have been that Crandall was not dead. If repayment had been made to her, she could not have successfully resisted recovery by these companies predicated upon the fact that her husband was alive. The first agreement did not in any manner assume to change the relations of the parties to this fund. The insurers did not agree to relinquish all their rights in the money after the expiration of the stipulated period. The burden would have been on them at any time to establish affirmatively Crandall was alive, but, beyond that, the one salient query lying at the threshold of any litigation over this fund must be, was Crandall alive at the time the proofs of death were furnished? Two years after the termination of the first agreement, proof again came to the insurers that Crandall was alive; that he had been apprehended at Los Angeles, California, and had been identified by acquaintances; and the second agreement was entered into. Mrs. Crandall claims she executed this agreement under duress. The testimony does not impress me favorably with that idea. The agreement is in substance like its predecessor. The same motives existed for its execution. The meeting at which it was executed was prearranged for the specific purpose of making it. She went to Mr. Tiffany's office voluntarily. The paper was read over to her, and she comprehended its terms. But, as I view the relations of the parties to this fund, the second agreement was of no significance, so far as affecting the real rights of the parties. After it was demonstrated Crandall was alive, the wife's title to the money paid her must be divested, and the refunding of the money could be compelled. The agreement making Bishop its custodian did not alter this vital principle in this peculiar case. This money was paid on the hypothesis Crandall was dead, and if this was untrue a mistake of fact existed, and the proposition is elementary that repayment to the insurers could be compelled. Pom. Eq. Jur. § 852 et seq.; Story, Eq. Jur. par. 140; Willard, Eq. Jur. p. 69; Rheel v. Hicks, 25 N. Y. 289; Bank v. Eltings, 40 N. Y. 391; Mayer v. Mayor, etc., 63 N. Y. 455. As Story says in paragraph 140: "The general rule is that an act done or contract made under a mistake or ignorance of a material fact is voidable and relievable in equity." But counsel for defendant strenuously urges there was no consideration for the second agreement. It is not of the slightest moment. The form of the action, even, is not affected by that question; for if she were the custodian of this property, instead of Bishop, the action would not necessarily be one at law, but a suit in equity would be the more probable, as the property is not all in money, but in a bond and mortgage and in real estate, and the relief sought would be the vesting of the title to this property in the insurers. If she voluntarily paid this money to the bank to await the issue of an investigation to ascertain whether or not Crandall was alive, the action would be maintainable against the custodian of the fund, and it could be in equity to restrain the payment to her. Again, the interposition of a court of equity is usually brought to compel the repayment of money paid by a mistake of fact. Even if the agreement is without consideration, it cannot materially affect the parties here, for they acted upon it as a binding agreement. They have recognized its validity, and it is only an unimportant side issue in a controversy, the pith of which is the existence

or nonexistence of Crandall. The vice in the defendant's claim is in a lower stratum than this agreement. But there was a good consideration entering into this agreement. She was in imminent danger of being sued for the recovery of this money or property. It had been paid under a mistake of fact, if her husband still lived. She was without a defense, if that fact existed. She wished to avert litigation and further publicity of these distressing details; hence the agreement is as much for her benefit as that of the insurers.

Again, defendant's counsel urges the well-recognized principle that the first agreement was the adjustment of a disputed demand, and its termination vested the property irrevocably in Mrs. Crandall. Such was not the scope of that agreement. Title to the property was not altered by this contract. Its preservation was its aim and purpose, and the insurers did not, upon its expiration, relinquish their right of recovery if Crandall should be found alive. Mrs. Crandall cannot complain of any maltreatment from these companies. She was paid the full sum stipulated in the policies. She has depleted the corpus of this fund materially. She has been paid the accruing interest upon it for nearly eight years, and during all this period the insured husband was alive. Judgment will be entered in favor of plaintiff for the relief demanded in the complaint.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

Arthur W. Hickman and Geo. W. Cothran, for appellant.
Charles A. Pooley, for respondent.

PER CURIAM.   Judgment affirmed, with costs, on the opinion of SPRING, J., delivered at special term.

(9 App. Div. 237.)

In re EMMETT.[1]

(Supreme Court, Appellate Division, Second Department.   October 26, 1896.)

ELECTIONS—FILING CERTIFICATE OF NOMINATION—DETERMINATION AS TO VALIDITY—REVIEW—LIMITATION.
        Laws 1896, c. 909 (Election Law) § 56, giving "the supreme court or any justice thereof" summary jurisdiction to review a determination as to the validity of a certificate of nomination by the officer with whom the certificate is required to be filed, and make such order as justice may require, "but such order must be made on or before the last day fixed for filing certificates of nomination," limits the time within which the appellate division of the supreme court may make an effective review of such an order by a justice thereof, as well as the time within which he may make the order.   Hatch, J., dissenting.

Appeal from special term.

Richard S. Emmett, Jr., and Joseph E. Ennis presented to the county clerk of Westchester county certificates of nomination for member of the assembly for the Second district of Westchester county, each claiming to be the regular nominee of the Republican party. The determination of the clerk in favor of Emmett was, on application of Ennis, reversed by a justice of the supreme court, who ordered the name of Ennis to be put on the official ballot as the Republican nominee, and from such order Emmett appeals.   Dismissed.

Argued before BROWN, P. J., and BARTLETT, CULLEN, HATCH, and BRADLEY, JJ.

[1] Reversed by the court of appeals. See 44 N. E. 1102.